CG AUTOMATION & FIXTURE, INC v AUTOFORM, INC

Docket No. 286361. Submitted May 11, 2010, at Grand Rapids. Decided January 20, 2011, at 9:00 a.m.

C.G. Automation & Fixture, Inc., brought an action under the molder's lien act, MCL 445.611 *et seq.*, in the Kent Circuit Court against Autoform, Inc., Key Plastics L.L.C., and others, seeking possession of several molds and dies that Autoform had ordered from C.G. Automation, then sold to Key Plastics without having paid for them. When C.G. Automation delivered the dies at issue to Autoform, it included information identifying itself as the moldbuilder pursuant to MCL 445.619(1), but it affixed this information to the separate metal risers used to adjust the dies' height, not to the dies themselves. Autoform did not include these risers when it shipped the dies to Key Plastics. C.G. Automation had initially sought possession of the dies under the Special Tools Lien Act, MCL 570.541 *et seq.*, and also brought various common-law claims that were ultimately dismissed against all defendants except Autoform. The court, James Robert Redford, J., entered a default judgment against Autoform and in favor of C.G. Automation. C.G. Automation filed a second amended complaint against the remaining defendants and moved for immediate possession of the dies under the molder's lien act. The court granted the motion with respect to the dies at issue, and Key Plastics appealed by leave granted.

The Court of Appeals *held*:

An enforceable molder's lien demands the presence of permanently affixed details identifying the moldbuilder on the mold, die, or tool. The circuit court clearly erred by finding that C.G. Automation had fulfilled this requirement, given that the required identification was affixed to objects that were readily removable from the dies.

Reversed and remanded for further proceedings.

GLEICHER, J., concurring, additionally wrote separately to recommend that the Legislature clarify the ambiguity created by the disjunctive language in MCL 445.619(4), which indicates that a moldbuilder's lien attaches when actual or constructive notice is received, and the conjunctive language in MCL 445.619(3), which

states that fulfilling the requirements of the previous two subsections gives rise to both actual and constructive notice.

LIENS — MOLDER'S LIENS — MOLDER'S LIEN ACT — MOLDBUILDERS' IDENTIFICATION — PERMANENTLY RECORDED MOLDBUILDERS' IDENTIFICATION.

The molder's lien act requires a moldbuilder to permanently record on every die, mold, or form the moldbuilder's name, street address, city, and state; this requirement demands the presence of permanently affixed details on the mold, die, or tool itself for an enforceable lien to be created (MCL 445.619[1], [3]).

*Bolhouse, Vander Hulst, Risko, Baar & Lefere, P.C.* (by *David S. Lefere*), for C.G. Automation & Fixture, Inc.

*Harvey Kruse, P.C.* (by *J. Kenneth Wainwright, Jr., William F. Rivard,* and *Kimberly A. Kardasz*), for Key Plastics L.L.C.

Before: MARKEY, P.J., and ZAHRA and GLEICHER, JJ.

GLEICHER, J. We granted leave in this case to consider a question of first impression arising under the Michigan ownership rights in dies, molds, and forms act, MCL 445.611 *et seq.*, also known as the molder's lien act. The precise question before us is whether an enforceable molder's lien attaches absent some form of permanently recorded information on the mold, die, or tool identifying the name of the moldbuilder, its street address, city, and state. We hold that an enforceable lien demands the presence of permanently affixed identifying details on the mold, die, or tool and that the dies at issue lacked this essential record. We reverse the circuit court's ruling to the contrary and remand for further proceedings.

### I. UNDERLYING FACTS AND PROCEEDINGS

Plaintiff, C.G. Automation & Fixture, Inc., manufactures tool and die equipment and sells its products to

automobile parts suppliers. Defendants Key Plastics L.L.C. and Autoliv A.S.P., Inc., supply parts to automobile manufacturers. Autoliv agreed to sell defendant Chrysler L.L.C. spoke covers for use in its JS41 vehicle platform. Chrysler applied the spoke covers as decorative features on the spokes of Chrysler Sebring steering wheels.

In September 2005, Autoliv sent Key Plastics a letter of intent to purchase spoke covers for JS41 vehicles. Defendant Autoform, Inc., quoted Key Plastics a price for the tooling necessary to manufacture the JS41 components. The tooling included production molds and metal trim dies. Key Plastics agreed to buy the tooling at the price quoted by Autoform. Autoform then turned to C.G. Automation for the design, fabrication, and manufacture of a portion of the JS41 tooling that Autoform had agreed to sell Key Plastics. C.G. Automation duly produced the required molds and dies and provided them to Autoform. The dispute before us concerns only the dies.

In September 2006, C.G. Automation shipped the dies to Autoform. On the date of shipment, C.G. Automation placed an identification tag on the risers accompanying the dies. According to Michael Elliott, C.G. Automation's plant supervisor, a riser is

> a precise metal bar that is machined and bolted to the bottom of the tool to establish a shut height or a tool shut height. You buy the die set . . . . If it doesn't meet the required shut height, you put risers underneath it, and you bolt them to the bottom, so when they go into a press, they meet a certain shut height.[1]

---

[1] "*Die shut height* is defined as the height of the die in the shut or closed position." Smith, *Quick Die Change* (Dearborn: Society of Manufacturing Engineers, 2d ed, 2004), ch 11, p 237. "In general, the shut height of a press is the maximum die height that can be accommodated

Elliott admitted that the risers could be removed from the die and transferred to another tool. Nonetheless, Elliott characterized "the risers" as "part of the die." When C.G. Automation shipped the dies to Autoform, C.G. Automation also filed a financing statement under the Uniform Commercial Code (UCC) identifying its possession of a lien on the tooling.

Autoform never paid C.G. Automation for the dies, and Autoform entirely ceased its operations in 2007. However, before Autoform closed its doors, it sold the dies to Key Plastics.[2] The parties agree that the dies arrived at the Key Plastics facility without the tagged risers. The dies currently reside in a Key Plastics plant in Pennsylvania, where the company has used them since 2007 in the manufacture of JS41 plastic parts. The record does not reveal the current location of the risers formerly attached to the dies.

In September 2007, C.G. Automation sued Autoform, Key Plastics, Autoliv, and Chrysler pursuant to the Special Tools Lien Act, MCL 570.541 et seq., and moved for immediate possession of the tooling. C.G. Automation's complaint also alleged breach-of-contract and unjust-enrichment claims. C.G. Automation later amended its pleadings by adding a claim under the molder's lien act. In November 2007, the circuit court denied the motion for immediate possession and entered a stipulated order dismissing the breach-of-contract and unjust-enrichment claims against Key Plastics, Autoliv, and Chrysler. Subsequently, the circuit

for normal operation . . . ." Auto/Steel Partnership, Stamping Task Force, *Selected Stamping and Formability Measurements*, § 3.1.2 <http://www.a-sp.org/database/viewsec.asp?sec=594> (accessed October 5, 2010).

[2] Key Plastics and Autoform fought a separate legal battle over the dies in the Washtenaw Circuit Court. They resolved their differences after Key Plastics agreed to pay Autoform for the tooling.

court entered a default judgment against Autoform and in favor of C.G. Automation.

In February 2008, C.G. Automation filed a second amended complaint and moved to enforce the molder's lien act and take immediate possession of the tooling if payment in full was not rendered. In May 2008, the circuit court conducted an evidentiary hearing, at which several witnesses testified. In a June 2008 written opinion and order, the circuit court explained, in pertinent part, that it would grant C.G. Automation's motions:

> 3. The testimony of the representatives of C. G. Automation are that the devices that left their plant . . . had the markings which are required to be on a device pursuant to MCL 445.619(4) and UCC lien registrations were filed by C. G. Automation. This testimony was credible and believed by the Court.
>
> 4. As a result of the identification tags being placed . . . and the UCC liens being registered for the devices . . . the plaintiffs [sic] are entitled to immediate possession and/or payment by the entity in possession of the [dies].

In October 2008, this Court granted Key Plastics' application for leave to appeal. *CG Automation & Fixture, Inc v Autoform, Inc*, unpublished order of the Court of Appeals, entered October 24, 2008 (Docket No. 286361).

## II. ANALYSIS

The construction and application of the molder's lien act presents a question of law that this Court considers de novo on appeal. *Delta Engineered Plastics, LLC v Autolign Mfg Group, Inc*, 286 Mich App 115, 119; 777 NW2d 502 (2009). We review for clear error a circuit court's findings of fact. MCR 2.613(C). "Clear error exists when the reviewing court is left with a definite

and firm conviction that a mistake has been made." *Massey v Mandell*, 462 Mich 375, 379; 614 NW2d 70 (2000).

In *Gateplex Molded Products, Inc v Collins & Aikman Plastics, Inc*, 260 Mich App 722, 726; 681 NW2d 1 (2004), another case arising under the molder's lien act, we restated the following general principles governing statutory interpretation:

> The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature in enacting a provision. Statutory language should be construed reasonably, keeping in mind the purpose of the statute. The first criterion in determining intent is the specific language of the statute. If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written. However, if reasonable minds can differ regarding the meaning of a statute, judicial construction is appropriate. [Citation and quotation marks omitted.]

In this case, the parties ask that we construe several sections of the molder's lien act and determine whether, when harmonized, the act supports the imposition of a molder's lien. In undertaking this task, we must avoid construing the statute in a manner that renders any statutory language nugatory or surplusage. *Robinson v City of Lansing*, 486 Mich 1, 21; 782 NW2d 171 (2010). When discerning legislative intent, we read the entire act and interpret a particular word in one statutory section only "after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole." *Grand Rapids v Crocker*, 219 Mich 178, 182-183; 189 NW 221 (1922). This Court considers both the plain meaning of critical words or phrases comprising the statute and their placement and purpose in the statutory scheme. *People v Blunt*, 282 Mich App 81, 84; 761 NW2d 427 (2009). In

summary, "[w]e construe an act as a whole to harmonize its provisions and carry out the purpose of the Legislature." *People v Hill*, 269 Mich App 505, 515; 715 NW2d 301 (2006) (citation and quotation marks omitted).

The pertinent portion of the molder's lien act, MCL 445.619, states as follows:

(1) A moldbuilder shall permanently record on every die, mold, or form that the moldbuilder fabricates, repairs, or modifies the moldbuilder's name, street address, city, and state.

(2) A moldbuilder shall file a financing statement in accordance with the requirements of section 9502 of the uniform commercial code, 1962 PA 174, MCL 440.9502.

(3) A moldbuilder has a lien on any die, mold, or form identified pursuant to subsection (1). The amount of the lien is the amount that a customer or molder owes the moldbuilder for the fabrication, repair, or modification of the die, mold, or form. The information that the moldbuilder is required to record on the die, mold, or form under subsection (1) and the financing statement required under subsection (2) shall constitute actual and constructive notice of the moldbuilder's lien on the die, mold, or form.

(4) The moldbuilder's lien attaches when actual or constructive notice is received. The moldbuilder retains the lien that attaches under this section even if the moldbuilder is not in physical possession of the die, mold, or form for which the lien is claimed.

(5) The lien remains valid until the first of the following events takes place:

(a) The moldbuilder is paid the amount owed by the customer or molder.

(b) The customer receives a verified statement from the molder that the molder has paid the amount for which the lien is claimed.

(c) The financing statement is terminated.

The plain language of MCL 445.619(1) dictates that a moldbuilder permanently record identifying information on every die, mold, or form it produces. The statute does not define the term "permanently record." "When considering a word or phrase that has not been given prior legal meaning, resort to a lay dictionary such as *Webster's* is appropriate." *Citizens Ins Co v Pro-Seal Serv Group, Inc*, 477 Mich 75, 84; 730 NW2d 682 (2007) (citation and quotation marks omitted). According to *Random House Webster's College Dictionary* (1997), p 971, the relevant definitions of "permanent" include "1. existing perpetually; everlasting," "2. intended to serve, function, etc., for a long, indefinite period," and "3. long-lasting or nonfading[.]" The relevant definition of "record" is "1. to set down in writing or the like, as for the purpose of preserving evidence." *Id*. at 1087.

In MCL 445.619(2), our Legislature adopted a second requirement, which is that the moldbuilder file a financing statement in conformity with MCL 440.9502, part of the UCC. In MCL 445.619(1) and (2), the Legislature clearly and unambiguously commanded that moldbuilders seeking an enforceable lien undertake two actions: "permanently record" specified identifying information on every die, mold, or form and "file a financing statement" under the UCC. Thus, the introductory subsections of the statute, (1) and (2), set forth two obligations relevant to the creation of a lien and its attachment. By placing these mandates at the beginning of the statute, the Legislature meant to convey that a moldbuilder seeking the benefits conveyed in the balance of the statute must comply with the predicate requirements.

Subsection (3) begins, "A moldbuilder has a lien on any die, mold, or form identified pursuant to subsection

(1)." MCL 445.619(3). This is the only portion of the statute directly addressing the *creation* of a lien. Notably, the Legislature elected not to create a lien effected through the filing of a financing statement. It could have done so by adding a second sentence here, stating to the effect that "a moldbuilder has a lien on any die identified pursuant to subsection (2)." Moldbuilder's liens are nonconsensual, and they exist even absent privity of contract. Because those who ultimately acquire the tooling may have never agreed to a lien or entered into a security agreement with the moldbuilder, as occurred in this case, the statute creates a remedial security interest in the moldbuilder.

After addressing the amount of a moldbuilder's lien in subsection (3), the statute turns to the manner in which the moldbuilder must supply the world with *notice* of the lien it acquired by complying with subsection (1). The third sentence of subsection (3) reads, "The information that the moldbuilder is required to record on the die, mold, or form under subsection (1) *and* the financing statement required under subsection (2) shall constitute actual *and* constructive notice of the moldbuilder's lien . . . ." MCL 445.619(3) (emphasis added). With this sentence, the Legislature indicated that a moldbuilder who complies with both requirements has given the world actual and constructive notice of the lien.

Having established the legal components of an enforceable molder's lien, we now consider whether the circuit court clearly erred by finding that C.G. Automation had permanently recorded identifying information on the dies. The record evidence agreed that C.G. Automation permanently affixed its identifying information to metal risers that could be separated from the dies and transferred for use with other tools. A Key Plastics engineer testified that

the risers "are just steel spacers that [sic] if you needed to adjust heights for some reason, but they would not be necessarily specific to a specific die." Although a C.G. Automation plant supervisor insisted at one point during the evidentiary hearing that the risers constitute a "part of the die[s]," substantial other evidence refutes this pronouncement. Abundant evidence establishes that a riser is not a die, but a separate and distinct device used in conjunction with a die. The two serve entirely different functions. "To treat them as synonymous . . . would be reminiscent of Lewis Carroll's Humpty-Dumpty as he scornfully chastised Alice 'when I use a word it means just what I choose it to mean—neither more nor less.' " *Maki v East Tawas*, 385 Mich 151, 159; 188 NW2d 593 (1971).

By directing moldbuilders to "permanently record on every die, mold, or form" identifying information, MCL 445.619(1), the Legislature clearly intended that subsequent possessors of a die would receive actual notice of the name and address of the moldbuilder. The Legislature elected to achieve this end by requiring a die fabricator to perpetually preserve its identity "*on* every die . . . ." *Id.* (emphasis added). The circuit court's determination that a moldbuilder could comply with the statutory mandate by permanently affixing its information to objects readily removable from the dies contravenes the plain meaning of MCL 445.619(1). Furthermore, the fact that Key Plastics has successfully used the dies without the accessory risers confirms that the risers simply are not equivalent to the dies. Consequently, our review of the entire relevant record leaves us with the definite and firm conviction that the circuit court made a mistake by finding that C.G. Automation had placed its identifying information on the dies. See *Massey*, 462 Mich at 379. Because C.G. Automation failed to perfect its lien in the manner prescribed under

MCL 445.619, we reverse the decision of the circuit court and remand for proceedings consistent with this opinion.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

GLEICHER, J. (*concurring*). I fully concur in the majority opinion, but write separately to express my belief that MCL 445.619(4) renders that section of the molder's lien act ambiguous. In my view, legislative reconsideration of the statutory language would benefit the tool-and-die and automotive industries as well as the legal community.

In MCL 445.619(1) and (2), the Legislature clearly and unambiguously commanded that molders seeking an enforceable lien undertake two mandatory actions by stating in subsection (1) that "[a] moldbuilder shall permanently record" specified identifying information on every die, mold, or form and in subsection (2) that "[a] moldbuilder shall file a financing statement" under MCL 440.9502. However, at this point the waters of statutory interpretation become muddied. Subsection (3) envisions that a moldbuilder will have "a lien on any die, mold, or form identified pursuant to subsection (1)." MCL 445.619(3). One reasonable interpretation of this language suggests that even absent the moldbuilder's filing of a financing statement, the moldbuilder will have acquired an enforceable lien if it has permanently affixed identifying information on the tool. But subsection (3) then continues, "The information that the moldbuilder is required to record on the die, mold, or form under subsection (1) *and* the financing statement required under subsection (2) shall constitute actual *and* constructive notice of the moldbuilder's lien . . . ." *Id.* (emphasis added). This sentence reasonably lends itself to construction in either of two

ways. The first is that the combination of permanent moldbuilder identification and the filing of a financing statement under the Uniform Commercial Code (UCC) together amount to actual and constructive notice of a lien. Alternatively, the Legislature perhaps intended that permanent identification constitutes actual notice, while a filed UCC statement equates with constructive notice; acceptance of this second reading would essentially obligate a court to engraft onto the final clause of subsection (3) the notion that the permanent recording and the UCC filing "shall constitute actual and constructive notice[, *respectively*,] of the moldbuilder's lien . . . ." Adoption of the second reading of subsection (3) thus would ignore the well-established principle of statutory construction that a court "is not free to add language to a statute or to interpret a statute on the basis of this Court's own sense of how the statute should have been written." *Kirkaldy v Rim*, 478 Mich 581, 587; 734 NW2d 201 (2007) (CAVANAGH, J., concurring); see also *In re Wayne Co Prosecutor*, 232 Mich App 482, 486; 591 NW2d 359 (1998) (emphasizing that "[a] court must not judicially legislate by adding into a statute provisions that the Legislature did not include").

Subsection (4) intensifies the interpretive difficulties presented by the molder's lien act. That subsection provides that a moldbuilder's lien attaches "when actual *or* constructive notice is received." MCL 445.619(4) (emphasis added). In the estimation of federal bankruptcy judge Phillip J. Shefferly, who construed the molder's lien act in *In re Plastech Engineered Prod, Inc*, 418 BR 235, 245 (ED Mich Bankr, 2009), subsections (3) and (4), when read together, render the statute "inescapably ambiguous."[1] Judge Shefferly reasoned:

---

[1] Although this Court may choose to agree with the analysis of a federal court decision, "federal court decisions are not precedentially binding on

> Sub[section] 4 injects an additional element of doubt in construing the statutes by providing that the lien "attaches when actual or constructive notice is received." The problem caused by this language is that under subsection 3, the references to the information required to be inscribed on the tooling and the financing statement required to be filed are written with the conjunctive *and*, which suggests that both acts together constitute actual and constructive notice of the lien. However, subsection 4 arguably calls this construction into question by using the disjunctive *or* between "actual" and "constructive" notice. The disjunctive *or* in this sentence suggests that there might be actual notice without constructive notice and vice versa. In other words, if the lien can attach when there is only the actual notice provided by the inscription on the tooling, does this mean that attachment can occur without the constructive notice that a UCC financing statement provides? Similarly, if there is only a UCC financing statement that provides the constructive notice, can attachment occur without the actual notice that is provided by the inscription on the tooling? [*Id.* at 244.]

Judge Shefferly resolved the statute's apparent ambiguity by examining its structure, legislative history, applicable caselaw, and secondary sources. *Id.* at 244-247. He concluded that MCL 445.619 "require[s] a two step process in order to obtain an enforceable lien: the permanent recording of information on the mold or tool, *and* the filing of a financing statement in accordance with section 9502 of the UCC." *Id.* at 247 (emphasis added). Judge Shefferly's reconciliation of the statutory language is entirely consistent with the result we reach today.

Our Supreme Court has emphasized that "[a] provision of the law is ambiguous only if it irreconcilably conflicts with another provision or when it is *equally*

---

questions of Michigan law . . . ." *American Axle & Mfg, Inc v Hamtramck*, 461 Mich 352, 364; 604 NW2d 330 (2000).

susceptible to more than a single meaning." *Fluor Enterprises, Inc v Dep't of Treasury*, 477 Mich 170, 177-178 n 3; 730 NW2d 722 (2007) (brackets and quotation marks omitted). I would hold that with regard to whether a molder's lien exists in the absence of a UCC filing statement, the statutory language is equally susceptible to more than a single meaning. I agree entirely with the sentiments expressed in an article published in the November 2010 *Michigan Bar Journal* that the molder's lien act is "in desperate need of overhaul" and that amendment "would foster more predictability in judicial construction and interpretation of the statutory language . . . ." Mears, *Amending the Michigan tooling lien statutes*, 89 Mich B J 11, 40 (Nov 2010). Nevertheless, I believe that the statute clearly and unambiguously envisions that absent the permanent recording of identifying information, a moldbuilder possesses no lien.