# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEFFREY RYAN GUNNELLS,

        Defendant-Appellant.

UNPUBLISHED
November 13, 2014

No. 317326
Wayne Circuit Court
LC No. 12-011108-FC

Before: WHITBECK, P.J., and FITZGERALD and MURRAY, JJ.

PER CURIAM.

The court convicted defendant of armed robbery, MCL 750.529, and conspiracy to commit armed robbery, MCL 750.529 and MCL 750.157a, and sentenced him to concurrent prison terms of 10 to 20 years for each conviction. The court also ordered defendant to pay $1,400 in restitution. Defendant appeals as of right. We affirm.

## I. FACTS

Andrew Jastrabek, the victim in this case, owned a tree trimming and firewood business at 33041 Beechwood in Westland. Defendant was an employee of the business. On November 10, 2012, two men, later identified as Justin Voyles and Musid Elhadi, approached Jastrabek and defendant as they were loading firewood for a delivery. Jastrabek was sprayed in the face with pepper spray and was then physically beaten and choked by Voyles and Elhadi. One of the men reached straight into Jastrabek's back pocket and took his wallet containing $1,400 in cash and $600 in checks. As the attack was occurring, Jastrabek called to defendant for help but did not receive any response. According to Jastrabek, defendant was standing about five feet from him during the attack. Defendant told Jastrabek that he did not come to his aid because he, too, had been held at gunpoint during the assault and that the two men had taken his wallet and his cell phone. Defendant left before the police arrived, telling Jastrabek that he was afraid he would go to jail because of outstanding warrants.

After a conversation with Jastrabek, Detective Sergeant Brooks became suspicious of defendant's behavior during and after the attack. Brooks "advised [Jastrabek] to have

-1-

[defendant] make arrangements to . . . come to the business." When defendant arrived, he was arrested and taken into custody. After being advised of his *Miranda* rights and agreeing to talk with Brooks, defendant stated that he had met a man named Jason[1] at a "dope house in Detroit." According to Brooks, defendant told him that Jason stated that he was looking for someone to rob and wanted to know if anybody in the house knew of someone that could be robbed. Defendant told Jason that his boss owned his own business and usually carried large sums of money on him. Defendant provided Jason with information about Jastrabek and the business, including its location. Text messages retrieved from defendant's cellular phone after the interview revealed that defendant informed Voyles of a "cake walk" opportunity that "was secluded and pay is great!! No chance for cops either." In the messages, defendant asked Voyles whether he was "[c]onfident he could choke dude out?" and Voyles responded, "yeah for sure." Defendant also offered to show Voyles around 33041 Beechwood, and told him where to park while he waited for two people to leave in a black Blazer so he could "[w]alk up. Choke out." Defendant also provided Jastrabek's cell phone number to Voyles and advised him to "call him and tell him you want to see his wood that you may want to buy."

## II. INSUFFICIENT EVIDENCE

Defendant asserts that the prosecutor failed to establish that pepper spray is a dangerous weapon and, therefore, the evidence was insufficient to support his convictions of armed robbery and conspiracy to commit armed robbery. Alternatively, defendant argues that the prosecution did not prove that defendant intended for a dangerous weapon to be used in the commission of the robbery and, therefore, the evidence supported only a conviction of unarmed robbery. We review de novo a challenge to the sufficiency of evidence. *People v Herndon*, 246 Mich App 371, 415; 633 NW2d 376 (2001). We must determine whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *Id*.

One of the elements of armed robbery is that the defendant is armed with a dangerous weapon while committing the assault. *People v Norris*, 236 Mich App 411, 414; 600 NW2d 658 (1999). We find this Court's analysis in *Norris* to be instructive in the instant case. In *Norris*, the defendant robbed a jewelry store using tear gas. *Id*. at 412–41. On appeal, the defendant argued that there was insufficient evidence to prove that the tear gas sprayed on store employees constituted a dangerous weapon within the meaning of the armed robbery statute. *Id*. at 413. This Court disagreed. *Id*. The victims testified that they experienced temporary physical injuries that required immediate medical treatment; the injuries included severe eye pain, burning sensations, and loss of breath. *Id*. at 418. This Court concluded that the evidence was sufficient for a reasonable jury to conclude that the tear gas was a dangerous weapon within the meaning of the armed robbery statute. *Id*. at 419. In *Norris* we stated:

---

[1] Jason was later identified as defendant Justin Voyles.

The armed robbery statute does not define the term "dangerous weapon." MCL 750.529; MSA 28.797; *People v Velasquez*, 189 Mich App 14, 17; 472 NW2d 289 (1991). However, "whether an object is a dangerous weapon depends upon the object itself and how it is used." *People v Barkley*, 151 Mich App 234, 238; 390 NW2d 705 (1986). Further, a dangerous weapon has been described as either (1) a weapon designed to be dangerous and capable of causing death or serious injury (e.g., a loaded gun) or (2) any other object capable of causing death or serious injury that the defendant used as a weapon (e.g., a screwdriver used as a knife). See CJI2d 18.1; *Barkley, supra*, see, also, *People v Goolsby*, 284 Mich 375, 378, 279 NW 867 (1938) (a dangerous weapon within the meaning of the felonious assault statute, MCL 750.82; MSA 28.277, is one that is deadly or capable of inflicting serious injury). Whether an object is a dangerous weapon under the circumstances of the case is a question for the factfinder. *Barkley, supra* at 238, n 1, 390 NW2d 705; *People v McCadney*, 111 Mich App 545, 550, 315 NW2d 175 (1981); see, also, *People v Jolly*, 442 Mich 458, 470; 502 NW2d 177 (1993) ("the factfinder must be permitted to determine the existence of a dangerous weapon ..."). [*Norris*, 236 Mich App at 414–415.]

In this case, the court considered several factors in determining whether the pepper spray used in this case was a dangerous weapon. The court considered the instruction on the label to seek immediate medical attention in case of exposure, and its description of the contents as a "strong irritant." The court also considered the purpose of this particular pepper spray, which it found was two-fold: "number one, to cause pain to someone else immediately, and secondarily to render them incapacitated." The court also considered that pepper spray with the same percentage of active ingredient (oleoresin) was used on new police officers during their training, which arguably could indicate "that therefore, it really can't be considered a dangerous weapon." Noting relevant authority holding that, a weapon need not cause a permanent injury in order to classify the weapon as "dangerous," the court concluded that the pepper spray used in this case was a dangerous weapon based on its "caution labels, the manner in which it was used, the injury that was inflicted on Mr. Jastrabek and how it rendered him temporarily incapacitated." The court reasonably concluded that the pepper spray constituted a dangerous weapon.

Defendant argues that the court erroneously relied on the label on the pepper spray canister because a product's label is not reliable evidence due to its "self-serving nature." The court did not rely exclusively on the label in concluding that the pepper spray was a dangerous weapon. The trial court used the label as a source of information about the product and considered it as one factor among others in determining that the pepper spray was a dangerous weapon. Moreover, defendant does not explain how the label's warning to seek medical attention was "self-serving" and unreliable. This argument is without merit.

Defendant's argument that Jastrabek's injuries were not serious enough to have been caused by a dangerous weapon is also without merit. In *Norris*, the effects suffered by the victims from exposure to the tear gas mixture were similar to those experienced by Jastrabek. The *Norris* Court held that the tear gas mixture had caused the victims' "serious" injuries, although they were not permanent and only two of the three victims required medical attention. Further, defendant's argument that that Jastrabek's injuries were not serious because they were not permanent, disfiguring, or life-threatening is misplaced. "Serious injury" is not synonymous

-3-

with permanent, disfiguring, of life-threatening. Additionally, *Norris* refers to a weapon's "capability" to cause serious injury, not whether the weapon actually caused serious injury. As the warning label indicates, pepper spray can lead to injury requiring medical treatment, i.e., it is "capable of causing . . . serious injury."

Defendant next argues that even if the pepper spray was a dangerous weapon, he was guilty only of unarmed robbery because there was no evidence that he knew a weapon would be involved in the robbery. As a result, he contends that there was insufficient evidence to suggest that he committed the felony of armed robbery. The prosecution's theory was that defendant conspired to commit armed robbery and aided and abetted Voyles and Elhadi in committing the armed robbery. A person who aids or abets the commission of a crime may be convicted and punished as if he directly committed the offense. MCL 767.39. "To support a finding that defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant [either] intended the commission of the crime or had knowledge that that the principal intended its commission at the time he gave aid and encouragement[,]" *People v Izarraras-Placante*, 246 Mich App 490, 486-497; 633 NW2d 18 (2001), "or, alternatively, that the charged offense was a natural and probable consequence of the commission of the intended offense," *People v Robinson*, 475 Mich 1, 15; 715 NW2d 44 (2006).

Defendant contends that there was no evidence that he intended to assist in an armed robbery because he did not discuss the use of pepper spray or any weapon with Voyles. We disagree. Defendant may be held liable as an aider and abettor for crimes that are the natural and probable consequences of the offense he intends to aid or abet, meaning those actions that further the "common enterprise" and which might be expected to happen if the occasion should arise. *Robinson*, 475 Mich at 9. The overwhelming evidence established that defendant gave active support to planning the robbery of Jastrabek. Having undertaken the robbery of a good-sized man in good physical shape who was in possession of a large sum of money, defendant can be held responsible for the natural and probable consequences of planning the robbery – here, the use of a weapon in order to subdue Jastrabek in order to steal the money contained in his pockets.[2] The evidence was sufficient to support defendant's conviction.

Defendant's argument that he is not guilty of conspiracy is also without merit. "A conspiracy is an agreement, express or implied, between two or more persons to commit an unlawful or criminal act." *People v Barajas*, 198 Mich App 551, 553; 499 NW2d 396 (1993). The text messages exchanged by defendant and Voyles provided overwhelming proof of

---

[2] Further, "Where more than one person is engaged in a robbery, and all are acting in concert, one of them being armed with a dangerous weapon, all are guilty of robbery armed whether any of the others were armed or not." *People v Abernathy*, 39 Mich App 5, 7; 197 nW2d 106 (1972). Because the use of a weapon during a robbery is foreseeable, this is true even if one of the perpetrators did not have knowledge of the existence of a weapon. *Id.*

defendant's agreement to commit armed robbery, and defendant also acknowledged his role in the crime during sentencing, calling his decisions "calculated" and "disgusting."

## III. SENTENCING GUIDELINES

Defendant argues that the trial court erred in scoring 20 points for offense variable (OV) 1, aggravated use of weapon, MCL 777.31, and 15 points for OV 2, lethal potential of weapon possessed or used, MCL 777.32, because pepper spray is not a "harmful chemical substance" as defined by MCL 750.200h.[3] "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*. Questions of constitutional law are also reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

OV 1 addresses the aggravated use of a weapon. MCL 777.31. A score of 20 points is appropriate where "the victim was subjected or exposed" to a harmful biological substance or device, a harmful chemical substance or device, or a harmful radioactive material or device. MCL 777.31(1)(b). At sentencing, defendant argued that OV 1 was improperly scored at 20 points because pepper spray was a "chemical irritant," not a chemical substance, and therefore a score of five points was appropriate. Defense counsel argued that scoring 20 points for use of pepper spray defied a common-sense reading of the statutes because OV 2, lethal potential of weapon possessed or used, scores only 10 points for possession or use of a short-barreled shotgun. See MCL 777.32(1)(c). The trial court scored OV 1 at 20 points over defense counsel's objections, and agreed with the prosecutor's comment that the fact that the scoring scheme "may be illogical to defense counsel doesn't mean that the Legislature didn't consider it." The court scored OV 2 at 15 points for the same reasons.

Defendant argues that the Legislature's definition of "harmful chemical substance" in MCL 750.200h indicates that it intended to punish terrorists who use chemical, biological or radioactive weapons. The statutory definition of the term provides that a "harmful chemical substance" is "a solid, liquid, or gas that through its chemical or physical properties, alone or in combination with 1 or more other chemical substances, can be used to cause death, injury, or disease in humans, animals, or plants." MCL 750.200h. A generic description of pepper spray states that it is "a temporarily disabling aerosol that is composed partly of capsicum oleoresin and causes irritation and blinding of the eyes and inflammation of the nose, throat, and skin." <http://www.merriam-webster.com/dictionary/pepper%20spray> (accessed July 25, 2014). It is also described as "a substance made from a chemical found in peppers that causes temporary blindness and pain to the nose, throat, and skin when it is sprayed on someone." *Id*. Based on

---

[3] The definition of "harmful chemical substance" in MCL 750.200h is incorporated into MCL 777.31 and 777.32.

these definitions, the trial court properly categorized pepper spray as a harmful chemical substance under MCL 750.200h.

In support of his claim that pepper spray is not a harmful chemical substance within the meaning of the statute, defendant argues that pepper spray is not harmful because it is made from chili peppers, and cites this Court's ruling in *People v Blunt*, 282 Mich App 81; 761 NW2d 427 (2009). In *Blunt*, the defendant was convicted of violating MCL 750.200i by using a harmful chemical substance for an unlawful purpose after he threw heated cooking oil on the victim, causing severe burns. *Id*., at 82-83. This Court concluded that cooking oil is not a harmful chemical substance as defined by MCL 750.200h because cooking oil, through its chemical properties, does not cause death, injury or disease. *Id*. at 85-86.[4] Defendant analogizes cooking oil to pepper spray because the main ingredient in pepper spray is derived from chili peppers, which are also used in cooking. This analogy is misplaced. Defendant did not use a chili pepper to harm the victim, and the victim did not sustain injury through the chemical or physical properties of the chili pepper. Rather, defendant used an aerosol spray that is made to cause irritation and blinding of the eyes and inflammation of the nose, throat, and skin. Pepper spray, though made with a chemical derived from a chili pepper, is not a chili pepper. Using defendant's logic, no chemical substance derived from materials which may be harmless in some form or quantity would fall under the purview of MCL 750.200h. There is no indication that the Legislature intended this result. The trial court did not err by scoring OV 1 at 20 points. For the same reasons, the court also did not err when it scored OV 2 at 15 points. See MCL 777.32(1)(a).

## IV. DUE PROCESS

Finally, defendant argues that the trial court violated his right to due process by increasing his minimum sentence based on facts not found by a jury. He argues that this error impacted the scoring of OVs 1, 2, 3, and 14. However, the court was not required to find any additional facts in order to classify the pepper spray used during the robbery as a harmful chemical substance. Rather, just as if defendant or his accomplices had used a firearm to commit armed robbery, the court scored OVs 1 and 2 based on its finding at trial that the pepper spray was a dangerous weapon. Similarly, the court did not have to engage in any additional fact-finding in order to score five points for OV 3, MCL 777.33(1)(e), physical injury to a victim not requiring medical treatment, as the victim's injuries were established during trial.

With regard to OV 14, MCL 777.44(1)(a), defendant's role in a multiple offender situation, because defendant's role in the armed robbery was not an element of the offense, the court had to find at sentencing that defendant was a leader in its commission in order to score 10 points for this variable. Defendant argues that increasing the minimum range of his sentence based on this finding violated his due process rights under *Alleyne v United States*, 570 US __;

---

[4] The court rejected the notion that an otherwise harmless chemical substance may be rendered harmful by an intervening act [such as heating water to the point of boiling], and thereby fall within the statutory definition in MCL 750.200h.

133 S Ct 2151; 186 L Ed 2d 314 (2013). We disagree for the reasons set forth in *People v Herron*, 303 Mich App 392, 403-404; 845 NW2d 533 (2013).

Affirmed.

/s/ William C. Whitbeck
/s/ E. Thomas Fitzgerald
/s/ Christopher M. Murray